NUMBER 13-02-607-CR

 

                         COURT OF APPEALS

 

               THIRTEENTH DISTRICT OF TEXAS

 

                  CORPUS CHRISTI - EDINBURG

 

 

 

RAFAEL JAVIER RODRIGUEZ,                                    Appellant,

 

                                           v.

 

THE
STATE OF TEXAS,                                              Appellee.

 

 

 

                  On appeal from the 92nd
District Court

                           of Hidalgo
County, Texas.

 

 

 

CONCURRING
OPINION

 

                                Before the Court En
Banc

                   Concurring Opinion by Justice
Castillo

 








Respectfully, for the reasons that follow, I concur
with the result. Appellant Rafael Javier Rodriguez's vehicle struck a
motorcycle on a public roadway.  A jury
found him guilty of intoxication assault,[1]  assessed a sentence at six years in the Texas
Department of Criminal JusticeBInstitutional Division,  and imposed a $10,000 fine.[2]  Rodriguez presents eleven issues for review.[3]  I address these seriatum, and
affirm.  

I. 
SUFFICIENCY OF THE EVIDENCE

In his first and second issues, Rodriguez argues
that the evidence is legally and factually insufficient to prove either (1)
intoxication, or (2) that the accident was caused by reason of that
intoxication.  The State counters that
the evidence sufficiently establishes that (1) while intoxicated and by reason
of that intoxication, (2) Rodriguez caused his vehicle to collide with the
victim's motorcycle, and (3) the victim sustained serious bodily injury.  

A.  Standard
of Review








A legal sufficiency challenge calls on us to review
the relevant evidence in the light most favorable to the verdict to determine
whether a rational trier of fact could have found the essential elements of the
crime beyond a reasonable doubt.  Jackson
v. Virginia, 443  U.S. 307, 319
(1979); Escamilla v. State, 143 S.W.3d 814, 817 (Tex. Crim. App.
2004).  In determining the factual
sufficiency of the elements of the offense, we view all the evidence neutrally,
not through the prism of "the light most favorable to the
prosecution."  Zuniga v. State,
144 S.W.3d 477, 484‑85 (Tex. Crim. App. 2004).   However, we approach a factual‑sufficiency
review with appropriate deference, to avoid substituting our judgment for that
of the fact finder.  Johnson v. State,
23 S.W.3d 1, 7 (Tex. Crim App. 2000) (en banc). 
The sufficiency of the evidence is measured against the elements of the
offense as defined by a hypothetically correct jury charge for the case.  See Malik v. State, 953 S.W.2d 234,
240 (Tex. Crim. App. 1997); Adi v. State, 94 S.W.3d 124, 131 (Tex. App.BCorpus Christi 2002, pet. ref'd).  The conviction will be upheld if the evidence is
sufficient to support a finding of guilt under any one of the theories
submitted.  Tex. Code Crim. Proc. Ann. art. 37.07, ' 1(a) (Vernon Supp.
2004-05) (verdict must be general); Kitchens v. State, 823 S.W.2d 256,
258 (Tex. Crim. App. 1991) (en banc).  

B.  The
Elements of Intoxication Assault 








The hypothetically correct jury charge in this case
would ask the jury if Rodriguez:  (1) by
accident or mistake, (2) while operating a motor vehicle, (3) in a public
place, (4) while intoxicated, (5) by reason of that intoxication, (6) caused
serious bodily injury to another.  See
Tex. Pen. Code Ann. _ 49.07(a)(1) (Vernon 2003).  "Intoxicated" means not having the
normal use of mental or physical faculties by reason of the introduction of
alcohol, or having an alcohol concentration of 0.08 or more.  See Tex.
Pen. Code Ann. ' 49.01(2)(A), (B) (Vernon 2003).  A person is criminally responsible if the
result would not have occurred but for his conduct, operating either alone or
concurrently with another cause, unless the concurrent cause was clearly
sufficient to produce the result and the conduct of the actor clearly
insufficient.  Tex. Pen. Code Ann. ' 6.04(a) (Vernon 2003).   

Rodriguez's argument on appeal focuses on the
elements of intoxication and causation by reason of intoxication.  I turn to the record evidence.

C.  Legal
Sufficiency Analysis








At approximately 9:30 p.m. on November 8, 2001,
Rodriguez drove his van on Magnolia Street where the street intersects with FM
88, a public road with one lane of travel going either direction.  Espiridion Jackson followed him in a separate
vehicle.  Meanwhile, Linda Perez, a
motorcycle-safety instructor, drove her motorcycle on FM 88 toward the Magnolia
Street intersection.[4]  Traveling at approximately 35 miles per hour,
she saw two headlights in her lane traveling toward her.  Perez reduced her speed to 25 miles per hour,
assuming that the driver was in the wrong lane to negotiate a turn somewhere in
front of her.  The vehicle continued its
approach in the wrong lane.  She
maneuvered her motorcycle to the far left of her lane and saw another set of
headlights directly behind the van approaching her, also in the wrong
lane.  With little time to spare and
aware that the first vehicle was not going to move out of her lane, but
concerned that the second vehicle might move to its proper lane, Perez  decided to "go to the ditch, the curb
instead of to the other lane because of the vehicle behind the van."  At that instant, the van was upon her.  The driver made no attempt to avoid the
collision.  The van did not stop before
the impact, which occurred in her lane. 
Perez recalled that she was on the ground pinned underneath the van, in
and out of consciousness, and in pain.  








The first officer on the scene, Jaime Cano,
testified that the motorcycle landed ten to fifteen feet from the point of
impact.  The van stopped approximately
eighty feet from the motorcycle.  Photographs
of the van admitted in evidence show damage to the front of the van on the
driver's side, consistent with a head-on impact.  Inside the van in plain view, Cano saw an
open 24-ounce container of beer on the left side of the front-seat
console.  The open container showed
condensation and appeared to be full. 
Through the open side door of the van, also in plain view, Cano saw
three unopened 24-ounce cans of beer on the floorboard behind the driver's
seat.[5]   Persons at the scene directed Cano to
Rodriguez as the driver of the van.  Cano
told Rodriguez to follow him to the police unit to talk.  While walking toward the unit, Cano
"smelled the strong odor of alcohol" when Rodriguez spoke.  Rodriguez told him he thought he hit a
dog.  Cano noticed Rodriguez "was
staggering as we were walking to the unit . . . to the point where he had to
hold on to [Cano's shoulder] to keep from falling down."  Rodriguez also told him that "the lights
were off."  Because Rodriguez was
trembling, staggering and Cano could smell alcohol, Cano told him to sit down
on the front seat of the unit for Rodriguez's personal safety.  Rodriguez complied.  Meanwhile, a video camera that Cano
personally installed in the police unit was operating.[6]  Cano returned to the impact scene to continue
his investigation of the scene.

Officer Garcia testified his supervisor instructed
him to transport Rodriguez to the police department.  Garcia was not aware that the videotape was
operating  while he transported Rodriguez
in Cano's unit.  On the way,  Rodriguez told Garcia the motorcycle did not
have its lights on and he thought he hit a dog. 
Admitted in evidence, the videotape reflects Rodriguez asked Garcia if
he smelled like beer.  Garcia responded
he did not smell anything.  The videotape
reflects Rodriguez stated, "I didn't see it coming . . . It was coming
with its light off . . . Do I smell like beer?"  Garcia testified that, in his opinion,
Rodriguez did not have the normal use of his mental and physical faculties at
the time.  

Officer Juan Rodriguez[7]
testified that the van traveled approximately seventy-nine feet from the point
of impact.  A strong odor of an alcoholic
beverage emanated from inside the van. The first time he contacted Rodriguez
was at a residence about an hour and twenty 
minutes after the accident.  
Rodriguez told the officer he drank "three to four beers."  The officer noticed Rodriguez's speech was
slurred.  Officer Rodriguez testified he
was ordered not to arrest Rodriguez.








Appellant Rodriguez testified that he drank less
than one beer that evening because of an upset stomach.  He was with E. Jackson and two other men who
drank beer in various amounts.  He denied
that he was intoxicated at the time of the collision.  He stated that the beer in the front seat
belonged to E. Jackson, who exited the van to drive his own vehicle to
Rodriguez's house.  Rodriguez testified
that the beers in a bag in the back of the van belonged to an employee of his
construction company.  Rodriguez admitted
he asked the transporting officer whether he smelled like beer.  He explained that after exiting the unit at
the police department, he told the officer that he had spilled beer on his
right sleeve.  Rodriguez denied that his
speech was slurred.  He denied he
staggered, explaining that, while walking toward the police unit with Cano, he
stepped over a cable and felt pain in his back. 
He testified he did not know whether he had alcohol on his breath
because, "I didn't smell it." 
Finally, Rodriguez denied that his speech on the videotape was
slurred.  








Regarding the collision, Rodriguez testified that on
the way to his nearby home,  he stopped
at the stop sign on Magnolia Street and waited for a vehicle to pass.  He then proceeded through the intersection,
making a "left turn and felt something hit the van."  "The hit was hard," he stated.  He did not see the motorcycle before
impact.  During cross-examination,
Rodriguez testified he thought he hit a dog because "It didn't seem like
an accident . . .  It didn't seem like an
impact, a big impact.  I didn't see any
lights."  He admitted he did not see
a dog on the roadway before the impact. 
Immediately after the collision, Rodriguez walked to his residence to
look for a jack stand so that he could lift the van and remove Perez, but he
did not find the tool.    Perez, the victim, testified that turning the
ignition on her motorcycle automatically turns on the headlights.  She testified that two driving lights mounted
on the engine guard of her motorcycle 
also turn on automatically.  Her
lights were on as she traveled on FM 88. 


Viewed in the light most favorable to the verdict,
evidence of the "loss of faculties" definition of intoxication in the
record includes:  (1) Rodriguez's slurred
speech; (2) staggering to the point of holding on to an officer's shoulder; (3)
the smell of alcohol on his breath; (4) his statement to an officer that he
drank "three to four" beers; (5) driving in the wrong lane of a
public road; (6) lack of awareness that a vehicle was approaching head-on; (7)
after a head-on collision with a motorcycle, traveling an additional
seventy-nine feet while dragging a person underneath; (8) admitting that he
never saw the headlights; (9) admitting that he never saw the motorcycle even
upon impact; and (10) officer Garcia's opinion that Rodriguez did not have the
normal use of his mental and physical faculties.[8]  I conclude that a rational trier of fact
could reasonably find beyond a reasonable doubt that Rodriguez did not have the
normal use of his mental of physical faculties by reason of the introduction of
alcohol.  See  Tex.
Pen. Code Ann. _ 49.01(A) (Vernon 2003).








Viewed in the light most favorable to the verdict,
evidence that the accident was caused by reason of intoxication includes the
same evidence to support he was intoxicated and:  (1) the accident occurred within walking
distance of Rodriguez's residence, from which the jury could infer it occurred
on a roadway familiar to him; (2) beginning at approximately 6:00 p.m. until
the time of the accident, Rodriguez was with three individuals who drank beer
in various amounts while they were together; and (3) the photographs admitted
in evidence showed damage to the van directly in front of the driver (as
compared with Rodriguez's testimony that he never saw the motorcycle).  The jury could reasonably conclude that
Rodriguez was driving his personal van on a familiar road.  The jury could reasonably infer that, by
reason of intoxication, Rodriguez caused serious bodily injury to Perez after a
head-on collision in which Rodriguez was the errant driver on a familiar
road.  See Tex. Pen. Code Ann. _ 6.04 (Vernon 2003); see also Sanders v. State,
119 S.W.3d 818, 821 (Tex. Crim. App. 2003) (a rational jury could have inferred
an ultimate fact); Evans v. State, 5 S.W.3d 821, 823 (Tex. App.BSan Antonio 1999, no pet.) (en banc) (finding evidence
legally and factually sufficient to prove loss of faculties definition). 

Viewing the evidence in the light most favorable to
the verdict, I conclude the evidence is legally sufficient to sustain the
elements of intoxication and causation by intoxication and agree to overrule
Rodriguez's first issue.

D.  Factual
Sufficiency Analysis








In his second issue, Rodriguez challenges the same
elements of intoxication and causation, arguing additionally that evidence of
the elements, if any, is too weak or greatly outweighed by contrary
evidence.  Rodriguez points to testimony
from law enforcement officers that he passed three field sobriety tests and
from laymen that he did not drink.  The
State counters that evidence sufficiently controverted Rodriguez's defensive
theory that he was not intoxicated.   

Our neutral review of all the evidence, both for and
against the challenged elements, looks to determine whether proof of guilt is
so obviously weak as to undermine confidence in the jury's determination, or
whether proof of guilt, although adequate if taken alone, is greatly outweighed
by contrary proof.  See Zuniga,
144 S.W.3d at 484‑85; see also Zuliani v. State, 97
S.W.3d 589, 593‑94 (Tex. Crim. App. 2003).  We remain mindful of the jury's role to
resolve conflicts in testimony.  See
Mosley v. State, 983 S.W.2d 249, 254 (Tex. Crim. App. 1998) (en banc)
(questions concerning the credibility of witnesses and the weight to be given
their testimony are to be resolved by the trier of fact); see also Esquivel
v. State, 506 S.W.2d 613, 615 (Tex. Crim. App. 1974).  We must assume that the fact finder resolved
conflicts, including conflicting inferences, in favor of the verdict, and must
defer to that resolution.  Matchett
v. State, 941 S.W.2d 922, 936 (Tex. Crim. App. 1996) (en banc).  With these principles in mind, I turn to the
evidence.








Evidence against the finding of the element of
intoxication includes testimony that Rodriguez passed three field sobriety
tests conducted by officer De Hoyos at the police station.[9]  The tests were witnessed by Garcia, who
transported Rodriguez to the station. 
While De Hoyos was "booking" Rodriguez, the police chief
Primitivo Rodriguez  arrived, asked if
Rodriguez passed the tests, and then requested that a test be performed in his
presence.  This was done, and Rodriguez
passed the one-leg balance test. 
According to the police chief, Rodriguez lifted his foot and did not
stagger.  The police chief then ordered
Rodriguez released because, based on his experience,  he was "not intoxicated."  However, officer Garcia testified that, in
his opinion, Rodriguez did not actually pass the test because he used a nearby
file cabinet for support, contrary to normal testing procedure.    

When officer Juan Rodriguez arrived at the police
station, he learned that Rodriguez had been released.  Officer Rodriguez testified he was the sole
officer in the department certified to perform field sobriety tests.  When he questioned that the tests were
performed by uncertified personnel, the police chief told him to contact
Rodriguez and re-test him.  Approximately
"one hour and forty to fifty minutes" after the collision, officer
Rodriguez administered three field sobriety tests on Rodriguez at a residence.[10]  Rodriguez passed all three.  








Evidence reflected that, at various times between
6:00 p.m. and 9:30 p.m (the time of the collision), Rodriguez was in the
company of E. Jackson, Jackson's brother Andres,  and Javier Guerrero.  Rodriguez admitted to drinking only one beer,
which he obtained at Andres's residence. 
Andres had begun drinking earlier, and continued to drink while in the
van.  The four traveled to a barbecue,
where, according to Rodriguez, the host and the host's two friends were
intoxicated.  Both the Jackson brothers
testified that they did not see Rodriguez drink that evening and that he was
not intoxicated.  When asked to clarify
grand jury testimony that he saw Rodriguez consume alcohol in the van, E.
Jackson explained, "[I]t's not what I meant to say. . . .  I didn't see him consume alcohol."  Jackson also testified that the beer in the
front seat of the van belonged to him.                                                     









Based on its resolution of historical facts and
credibility determinations, the jury implicitly rejected evidence favorable to
Rodriguez, including evidence that he did not consume an intoxicating beverage
and was not intoxicated.  The jury, as
fact-finder, could have disbelieved all the witnesses or any of them, and was
free to reject their testimony.  Mosley,
983 S.W.2d at 254; Esquivel, 506 S.W.2d at 615.  Additionally, the jury could have reasonably
inferred that De Hoyos's field sobriety tests were unreliable because he was
not certified and because of testimony that Rodriguez used a file cabinet for
support.  Similarly, the jury could have
reasonably inferred that the final field sobriety test, conducted at least an
hour and twenty minutes after the collision, was too remote in time to be
reliable.  Finally, the jury could have
reasonably concluded that evidence of Rodriguez's intoxication, taken together
with evidence of his operation of a motor vehicle on the wrong lane on a
familiar roadway toward an oncoming motorcycle that he never saw, outweighed
evidence that he passed the field sobriety tests.  See Tex.
Pen. Code Ann. '_ 49.01(A), 49.07(a)(1) (Vernon 2003); see also
 Evans, 5 S.W.3d at 823.  The same evidence allowed the jury to
reasonably infer that, by reason of that intoxication, Rodriguez caused Perez
serious bodily injury.  See Tex. Pen. Code Ann. '_ 6.04, 49.07(b) (Vernon 2003).[11]

Because we must assume that the jury resolved
conflicts, including conflicting inferences, in favor of the verdict, I defer
to that resolution.  Mosley, 983
S.W.2d at 254.  Thus, viewing the
evidence in a neutral light, I conclude that evidence supporting the elements
of intoxication and causation by intoxication is not too Iak to support the
jury's finding beyond a reasonable doubt; nor is the Iight of the contrary
evidence strong enough that the State could not have met its burden of
proof.  Zuniga, 144 S.W.3d at 484‑85.  Thus, the evidence is factually sufficient to
sustain the elements of intoxication and causation by intoxication.  I agree with the majority decision to overrule
Rodriguez's second issue.

II.  MOTION TO
SUPPRESS








By his third through seventh issues, Rodriguez
argues the trial court erred in denying his motion to suppress[12]
based upon (a) unlawful arrest (third issue), (b) unlawful detention (fourth
issue), (3)  noncompliance with statutory
warnings in article 38.22 (fifth issue),[13]
(4) unlawful detention (sixth issue), and (5) noncompliance with the
transportation code (seventh issue). 
Rodriguez asserts that, under article 38.23, the trial court must
suppress the evidence.[14]  The State counters that the trial court
properly denied the motion on each of the grounds presented.

A.  Standard
of Review








A trial court's ruling on a motion to suppress is
generally reviewed for abuse of discretion. 
Tex. Code Crim. Proc. Ann.
art. 28.01(1),(6) (Vernon 1989); Oles v. State, 993 S.W.2d 103, 106
(Tex. Crim. App. 1999); Maddox v. State, 682 S.W.2d 563, 564 (Tex. Crim.
App. 1985) (en banc); Ford v. State, 26 S.W.3d 669, 672 (Tex. App.BCorpus Christi 2000, no pet.).  We review a trial court's ruling on a motion
to suppress under the bifurcated standard enunciated in Guzman v. State,
955 S.W.2d 85, 87-88 (Tex. Crim. App. 1997). 
At a suppression hearing, the trial court is the sole finder of fact.  Arnold v. State, 873 S.W.2d 27, 34 (Tex.
Crim. App. 1993). The trial court is free to believe or disbelieve any or all
of the evidence presented.  Romero v.
State, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990) (en banc); see Johnson
v. State, 803 S.W.2d 272, 287 (Tex. Crim. App. 1990) (en banc).  Thus, in reviewing a trial court's ruling on
a motion to suppress, we give almost total deference to the trial court's
determination of historical facts and application-of-law-to-fact questions that
turn on credibility and demeanor.  Perales
v. State, 117 S.W.3d 434, 437 (Tex. App.BCorpus
Christi 2003, no pet.); Morrison v. State, 71 S.W.3d 821, 827 (Tex. App.BCorpus Christi 2002, no pet.).  We review de novo application-of-law-to-fact
questions that do not turn on credibility and demeanor.  Morrison, 71 S.W.3d at 827.  In the absence of explicit fact findings, we
assume that the trial court's ruling is based on implicit fact findings
supported in the record.  Perales,
117 S.W.3d at 437; see Carmouche v. State, 10 S.W.3d 323, 332 (Tex.
Crim. App. 2000) (recognizing implicit fact findings).  We then review de novo whether the facts,
express or implied, are sufficient to provide legal justification for admitting
the complained-of evidence.  See
Morrison, 71 S.W.3d at 827 (citing Garcia v. State,
43 S.W.3d 527, 530 (Tex. Crim. App. 2001)). 








In determining whether a trial court's decision is
supported by the record, we ordinarily consider only evidence adduced at the
suppression hearing.  See Rachal v.
State, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996) (en banc).  However, this general rule is inapplicable
where, as in this case, the suppression issue has been consensually re‑litigated
by the parties during trial on the merits.[15]  Id. 
Where the State raises the issue at trial, either without objection or
with subsequent participation in the inquiry by the defense, the defendant has
made an election to re‑open the evidence, and consideration of the
relevant trial testimony is appropriate in our review.  Id. 
Moreover, it would be unreasonable to ignore trial evidence in our
review of the trial court's suppression decision, only to be confronted by the
evidence in our consideration of whether the error was harmless.  See Tex.
R. App. P.44.2; Rachal, 917 S.W.2d at 809.   

We uphold a trial court's ruling on a suppression
motion if it is reasonably supported by the record and is correct on any theory
of law applicable to the case. Villarreal v. State, 935 S.W.2d 134, 138
(Tex. Crim. App. 1996 (en banc); Perales, 117 S.W.3d at 438.  This is true even if the decision is correct
for reasons different from those espoused by the trial court.  Romero, 800 S.W.2d at 543.  On the other hand, if the issue is whether an
officer had probable cause to seize a suspect, under the totality of the
circumstances, the trial judge is not in an appreciably better position than
the reviewing court to make that determination.  Guzman, 955 S.W.2d at 87; see also
Loserth v. State, 963 S.W.2d 770, 772 (Tex. Crim. App. 1998).  Thus, we will review each of Rodriguez's
issues concerning the ruling on his motion to suppress based on the ground
presented.  Because the trial court did
not make explicit findings of fact, we will review the evidence in a light most
favorable to the trial court's ruling.  Maxwell
v. State, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002) (en banc).  We will not disturb any ruling on a motion to
suppress that is supported by the record. 
Gruber v. State, 812 S.W.2d 368, 370‑71 (Tex. App.BCorpus Christi 1991, pet. ref'd); see Villarreal,
935 S.W.2d at 138; Perales, 117 S.W.3d at 438. 

B.  The
Evidence








Rodriguez argues that he was illegally detained,
illegally arrested, and that evidence gathered in violation of his
constitutional right against unreasonable searches and seizures should have
been suppressed.  By his motion,
Rodriguez sought to suppress "the fruits of everything derived from the
unlawful arrest and detention which would include the videotape in the police
car (State's Exhibit 2), everything that transpired at the police station, and
any kind of refusals at the police station and subsequent refusals."  

The parties do not dispute that:  (1) at the time in question, Rodriguez was a
part-time municipal judge and, by virtue of his position, worked with the
officers involved in the investigation of the collision, and knew statutory and
arrest procedures;[16]
(2) concern for his safety was the reason that Cano requested that Rodriguez
sit in the front seat of the police unit and that De Hoyos requested that
Garcia transport him to the police station;[17]
(3) officers Cano, Garcia, J.P. Rodriguez, and De Hoyos testified that they did
not arrest Rodriguez; (4) the police chief ordered officer Rodriguez not to
arrest him; (5) a search warrant did not issue; (6) en route to the police
station, officer Garcia did not question Rodriguez; (7) Rodriguez and officer
Garcia were unaware of Cano's personal video camera in the unit or that it was
recording; (8) officers did not give Rodriguez Miranda warnings or
handcuff him; and (9) sobriety tests were not performed at the scene.








As part of our sufficiency analysis, I have reviewed
the evidence adduced at trial.  The
following is additional evidence adduced at the suppression hearing, viewed in
the light most favorable to the trial court's ruling.  See Maxwell,  73 S.W.3d at 281.

Appellant Rodriguez testified that the collision
occurred "right at the corner of his house," approximately forty feet
distant.  Officer Cano approached him
while Rodriguez stood near his wife and "advised my wife he would have to
take me in." When taken to the police department, he did not feel free to
leave.  Once at the station, he was taken
through the entrance used for prisoners and was escorted to a holding room.[18]  He was not told he could not leave.  Rodriguez testified that after passing the
sobriety tests, he was released to the custody of E. Jackson.[19]  Based on his judicial duties, Rodriguez  was familiar with Miranda
warnings.  Rodriguez testified that he
knew that, when an accused refuses to take a blood or breath test for alcohol,
the individual is immediately arrested. 
Rodriguez denied he was given the statutory warnings or asked to provide
either a breath or blood specimen.[20]    








E. Jackson testified that, after Rodriguez was
released and driven by Jackson to his former residence, officer Rodriguez
arrived to perform a field sobriety test. 
E. Jackson denied that the officer read Rodriguez the statutory DWI
warnings or requested  a breath or blood
test.  He admitted that the officer did
not state Rodriguez was under arrest.  

Officer Rodriguez testified that, when he began
reading the statutory warnings, both Rodriguez and E. Jackson interrupted
him.  He asked Rodriguez three or four
times if he would submit to a breathalyzer test and Rodriguez refused.  Rodriguez also refused to sign the relevant
forms.  

Officer Garcia testified that, at the scene of the
collision, he looked to his superior De Hoyos for guidance and was instructed to
escort Rodriguez to the police department for his safety and for field sobriety
tests.  De Hoyos testified that he would
not have allowed Rodriguez to leave the scene but did not communicate that to
him.  De Hoyos denied Rodriguez was under
arrest.  The record shows that the trial
court viewed the videotape. 
Subsequently, the trial court denied the motion to suppress.  

C.  Fourth
Amendment and Article 38.23








In his third and fourth issues, Rodriguez asserts
his rights under the Fourth Amendment and article 38.23, claiming an illegal
arrest and detention.[21]  In his sixth issue, he argues that the trial
court should have suppressed the alleged breath-test refusal because of the
illegal arrest and detention.  The State
counters that Rodriguez was not unlawfully detained or arrested and, thus, the
trial court did not err in denying the motion to suppress.  

D.  Detention
Claim








 An accused
seeking to suppress evidence on the basis of illegal police conduct bears the
burden of proof to rebut a presumption of proper police conduct.  Moreno v. State, 124 S.W.3d 339, 344 (Tex.
App.BCorpus Christi 2003, no pet.) (citing McGee v.
State, 105 S.W.3d 609, 613 (Tex. Crim. App. 2003)).  A law enforcement officer may conduct a brief
investigative detention, or "Terry stop," when he has a
reasonable suspicion to believe that an individual is involved in criminal
activity.  Terry v. Ohio, 392 U.S.
1, 30-31 (1968); Balentine v. State, 71 S.W.3d 763, 768 (Tex. Crim. App.
2002); Carmouche, 10 S.W.3d at 328. 
Reasonable suspicion exists if the officer has specific articulable
facts that, when combined with rational inferences from those facts, would lead
him to reasonably suspect that a particular person has engaged or is (or soon
will be) engaging in criminal activity.  Garcia,
43 S.W.3d at 530; Woods v. State, 956 S.W.2d 33, 35 (Tex. Crim.
App.1997) (en banc).  The articulated
facts that support a temporary detention must be taken as a whole, and the
reasonable suspicion formed must be based on the totality of the
circumstances.  Woods, 956 S.W.2d
at 38.  Where the initial detention is
unlawful, any evidence seized subsequent to such a detention is
inadmissible.  Gurrola v. State,
877 S.W.2d 300, 302 (Tex. Crim. App.1994) (en banc).  The ultimate standard set forth in the Fourth
Amendment is reasonableness.  Cady v.
Dombrowski, 413 U.S. 433, 439 
(1973).

In this case, officer Cano arrived at the scene of a
motor vehicle accident involving 
Rodriguez as the driver, with the victim trapped underneath Rodriguez's
van.  He observed the vehicle had dragged
the victim a considerable distance before stopping.  Cano smelled the strong odor of alcohol on
Rodriguez's breath, and he observed Rodriguez stagger such that he held on to
Cano at one point.  Similarly,
sergeant  De Hoyos smelled alcohol on
Rodriguez's breath.  Officer Rodriguez
observed in plain view an open beer container on the driver's side console in
the car and three closed beer containers behind the driver's seat.  Officer Rodriguez also smelled a strong odor
of alcohol emanating from the open van. 
Officer Garcia did not question appellant Rodriguez en route to the
police department.  The final field
sobriety test was performed approximately an hour and twenty minutes after the
accident and subsequent to Rodriguez's leaving the police department.[22]









I conclude that the officers had specific
articulable facts to support the right to investigate a vehicular accident
involving serious bodily injury,[23]
and that they were engaged in a community caretaking function, "totally
divorced from the detection, investigation, or acquisition of evidence relating
to the violation of a criminal statute." 
See Cady, 413 U.S. at  446
("These officers in a rural area were simply reacting to the effect of an
accidentBone of the recurring practical situations that
results from the operation of motor vehicles and with which local police
officers must deal every day."); Maxcey v. State, 990 S.W.2d 900,
903 (Tex. App.BHouston [14th Dist.] 1999, no pet.).  While engaged in a community caretaking
function, the officers observed signs symptomatic of an intoxication
offense,  including Rodriguez's own
condition and the open beer container.  See,
e.g., Tex. Pen. Code Ann. _49.031(a)(1) , (b) (Vernon 2003) (a person commits
an offense if in knowing possession of an "open container" of an
alcoholic beverage in a motor vehicle). 
I conclude the officers presented specific and articulable facts
sufficient to support a reasonable suspicion to detain Rodriguez for further
investigation.  See Perales, 117
S.W.3d at 439.  








De Hoyos testified that field sobriety tests were
not performed at the scene because of Rodriguez's public position and the crowd
at the scene.  Once Rodriguez passed the
tests while at the police station, he left. 
I agree with the State that "the sequence of events is consistent
with an investigative detention of a person reasonably suspected of criminal
activity to maintain the status quo while obtaining more
information."  Terry, 392
U.S. at 20-21.  Thus, I conclude the
detention was for investigative purposes and justified.  Accordingly, I would uphold the trial court's
ruling on the suppression motion  because
the ruling is reasonably supported by the record and is correct on the theory
of lawful detention for investigative purposes. 
See Villarreal, 935 S.W.2d at 138; Perales,
117 S.W.3d  at 438.  I agree with the majority to overrule
Rodriguez's fourth issue.  

In his third issue, Rodriguez asserts that the trial
court erred in denying his motion to suppress due to unlawful arrest.  He asserts he was deprived of his freedom in
a significant way and, thus, was arrested without a warrant or probable cause
for an arrest.  Because I conclude, as a
matter of law, that the police conduct in this case is consistent with a lawful
detention for purposes of investigation, I do not reach Rodriguez's third issue
claiming unlawful arrest.  See Tex. R. App. P. 47.1.  Even so, the police conduct is inconsistent
with an arrest.  See Dowthitt v. State,
931 S.W.2d 244, 254-55 (Tex. Crim. App. 1996). 
Each officer in contact with Rodriguez denied he arrested him.  By its ruling, the trial court implicitly
rejected Rodriguez's subjective belief that he was arrested.  See Perales, 117 S.W.3d at 437.  Giving proper deference to the trial court
on a question of law that turns on credibility of the witnesses, I would uphold
the trial court's ruling.  Id.  I would overrule Rodriguez's third issue.

In his sixth issue, Rodriguez argues that the
detention at the residence subsequent to his release from the police department
was unlawful and, thus, the second refusal to take the breath test should have
been suppressed.  The State counters that
no detention occurred at the residence, and, even if it did, officer Rodriguez
had reasonable suspicion to detain Rodriguez. 









The second refusal occurred after the police chief
ordered Rodriguez's release.  Evidence
shows that the sole basis for the encounter was to confirm that Rodriguez
passed a field sobriety test administered by an officer certified in the
procedure, officer Rodriguez.  Officer
Rodriguez testified that by the time he arrived at the accident scene,
Rodriguez was no longer there.  Similarly,
by the time officer Rodriguez arrived at the police department, Rodriguez was
gone.  Thus, he first contacted Rodriguez
at the residence where he went to perform the field sobriety test that only
officer Rodriguez was certified to administer. 
I conclude that, under the totality of the circumstances leading to the
encounter, the detention, if any, was in furtherance of the investigative
detention and, thus, not unlawful.  Perales,
117 S.W.3d at 437.   I conclude that
justification is supported by specific and articulable facts in the
record.  Because I conclude that the
detention was lawful, I also conclude that the trial court properly denied the
motion to suppress Rodriguez's refusal to take the breath tests because they
were not products of an illegal detention. 
See Tex. Code Crim. Proc.
Ann. art. 38.23 (Vernon 2005).  I
would overrule Rodriguez's sixth issue.  

E.  Article
38.22 Claim

In his fifth issue, Rodriguez argues that the trial
court should have suppressed the videotape because (1) he was unlawfully
arrested, and (2) he was not given the statutory admonishments in article
38.22.  See Tex. Code. Crim. Proc. Ann. art. 38.22
(Vernon 2005).  The State counters that
Rodriguez was neither in custody nor interrogated.  








Article 38.22 provides that no oral statement of an
accused made as the result of custodial interrogation shall be admissible
against the accused in a criminal proceeding unless he is properly warned.  See Tex.
Code Crim. Proc. Ann. art. 38.22(3)(a)(2) (Vernon 2005); see also
Miranda v. Arizona, 384 U.S. 436, 479 (1966).  However, article 38.22 does not preclude
admission of a statement (1) made by the accused that does not stem from a
custodial interrogation, or (2) of a voluntary statement (whether or not the
result of custodial interrogation) that has a bearing upon the credibility of
the accused as a witness, or (3) of any other statement that may be admissible
under law.  Tex. Code Crim. Proc. Ann. art. 38.22(3)(a)(5) (Vernon 2005).
Thus, if either the "custodial" or "interrogation"
predicates are not met, then article 38.22 does not apply.  Villarreal v. State, 61 S.W.3d 673,
680 (Tex. App.BCorpus Christi 2001, pet. ref'd).  Interrogation includes speech or conduct by
the police which the police should know is reasonably likely to elicit an
incriminating response from the suspect. 
Id. (citing Rhode Island v. Innis, 446 U.S. 291, 308
(1980)).  

Implicit in the trial court's ruling is the
conclusion that Rodriguez was not under arrest. 
The officers did not give Miranda warnings because he was not
under arrest, and, uniformly and while not acting together, their actions are
consistent with no arrest.  Although
officer Garcia did not warn Rodriguez while the video camera recorded his
statements en route to the police station, Garcia testified Rodriguez was not
under arrest and the statements were recorded by equipment that officer Garcia
did not know was operating.  By his
motion, Rodriguez sought to suppress the videotape. 








I have viewed the videotape.  Officer Garcia did not question Rodriguez or
engage in conduct reasonably likely to elicit an incriminating response from
the suspect.  Id.  Rather, Rodriguez spoke, unprompted by the
officer.  I conclude that Rodriguez's
statements were not made in response to any interrogation.  See id.  Since Rodriguez's statements were not the
product of custodial interrogation, the admission of the statements in evidence
is not precluded by article 38.22(5). See Tex. Code Crim. Proc. Ann. art. 38.22(5) (Vernon 2005).  

I further conclude that the trial court's implicit
ruling that Rodriguez was not under arrest is supported by the record and that
his videotaped statements were not the result of interrogation.  Accordingly, neither the
"custodial" nor "interrogation" predicates are met.  Thus, article 38.22 does not apply.  See Villarreal, 61 S.W.3d at
680.  For these reasons, I would overrule
Rodriguez's fifth issue.

F. 
Transportation Code Violation Claim








In his seventh issue, Rodriguez argues that the
trial court should have suppressed the breath-test refusal at the residence
because officer Rodriguez did not give him the warnings mandated by section
724.015 of the Texas Transportation Code. 
See Tex. Transp. Code Ann.
_ 724.015 (Vernon Supp. 2004-05).[24]  The State counters that Rodriguez was not
under arrest when the refusal occurred as required by section 724.015, and his
refusal was admissible under section 724.061 of the transportation code.[25]  Tex.
Transp. Code Ann. _ 724.061 (Vernon 1999).

The purpose behind section 724.015 is "to
ensure that a person who refuses to give a requested specimen does so with a
full understanding of the consequences." 
Nebes v. State, 743 S.W.2d 729, 730 (Tex. App.BHouston [1st Dist.] 1987, no pet.).

Rodriguez testified he was aware of arrest
procedures and statutory warnings, and at one point, stated, "On cases
like this, you arrest a person if he refuses a breathalyzer, you arrest them
right there on the spot."   At the
motion to suppress hearing, defense counsel argued that the refusal to take the
breath test should be suppressed, under Tex. Dep't. of Pub. Safety v. Watson,
945 S.W.2d 262, 266 (Tex. App.BHouston [1st Dist.] 1997, no writ).  Watson states, in part, that
provisions of the statute apply "postarrest."  Id. 
On appeal, Rodriguez bases his argument on grounds that the statutory
warnings are required "if a person is arrested." 

I have concluded that Rodriguez was not under arrest
when officer Rodriguez contacted him. 
Officer Rodriguez asked Rodriguez "three or four times" to
submit to a breathalyzer test and he refused. 
Rodriguez also refused to sign the relevant forms.  Officer Rodriguez testified that Rodriguez
interrupted when he attempted to read the statutory warnings. 








Considering the totality of circumstances, I
conclude that the trial court's implicit ruling that the transportation code
was not violated, on the theory that 
Rodriguez was not under arrest, is supported by the record.  Further, the trial court could have
reasonably concluded that, by virtue of his admitted professional experience,
Rodriguez had judicial notice of the consequences of the test refusal and,
thus, the purpose of section 724.015 was met. 
See Nebes, 743 S.W.2d at 730.  Similarly, the trial court could have
reasonably concluded that officer Rodriguez substantially complied with section
724.015 by asking Rodriguez "three or four times" to test and Rodriguez
expressly refused, on grounds that Rodriguez, by virtue of his admitted
experience, was aware of the consequences of his refusal.  Finally, the trial court could have
reasonably concluded that the test refusal was relevant evidence admissible
under rule 402 of the Texas Rules of Evidence or section 724.061 of the
transportation code.  See Tex. Transp. Code ' 724.061 (Vernon 1999); Tex. R. Evid. 402; Montgomery v. State,  810 S.W.2d 372, 391 (Tex. Crim. App.1990) (en
banc) (appellate court should not reverse a trial court's evidentiary ruling
that is "within the zone of reasonable disagreement").  

Accordingly, I would uphold the trial court's ruling
because it is reasonably supported by the record and is correct on various
theories of law applicable to the case.  Villarreal, 935 S.W.2d at 138.  I would overrule Rodriguez's seventh issue.

III. 
EXCLUSION OF EVIDENCE








In his eighth issue, Rodriguez argues that the trial
court abused its discretion by excluding from evidence at trial two photographs
he intended to use to demonstrate political pressure to arrest him, a mayoral
candidate.  The photographs depict a
wheelchair and a motorcycle at a polling place.[26]  The State counters that the tactics used by
Rodriguez's political opponent were not relevant to the determination of guilt.


A.  Standard
of Review

A trial court's admission or exclusion of evidence
is reviewed under an abuse of discretion standard.  Torres v. State, 71 S.W.3d 758, 760
(Tex. Crim. App. 2002); Salazar v. State, 38 S.W.3d 141, 153‑54
(Tex. Crim. App. 2001).[27]  A trial judge is given wide discretion when
deciding admissibility of photographs. 
Sonnier v. State, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995) (en
banc).  If elements of a photograph  are genuinely helpful to the jury in making
its decision, the photograph is inadmissible only if its emotional and prejudicial
aspects substantially outweigh its helpful aspects.  Erazo v. State, 144 S.W.3d 487, 491‑92
(Tex. Crim. App. 2004). 

B.  The
Evidence








Outside the jury's presence, Rodriguez testified
that he defeated the mayoral incumbent and proceeded to a run-off
election.  He took the two photographs on
the run-off election day.  The
photographs are black and white, and show a wheel chair with a sign on it that
states, "[presumably, the opponent's name] helps not . .
.[illegible]."  The trial court
ruled the photographs inadmissible on grounds that they were not relevant,
pronouncing, in part, "I don't want to politicize this case.  What happened that night is going to stay
what happened that night."  

C.  Analysis

A photograph is relevant if it has "any
tendency to make the existence of any fact that is of consequence to the
determination of the action more probable or less probable than it would be
without the evidence."  Tex. R. 
Evid. 401; see also Tex.
R.  Evid. 402, 403.  I conclude that the photographs contain no
elements  that would be helpful to the
jury in reaching its decision on Rodriguez's culpability.  Erazo, 144 S.W.3d at 491‑92.  I further conclude that the emotional and
prejudicial aspects of the photographs substantially outweigh any perceived
helpful aspects.  Id.  Accordingly, the trial court's ruling to
exclude the photographs was within the zone of reasonable disagreement.  See Montgomery, 810 S.W.2d at
379.  Thus, the trial court did not abuse
its discretion.  Id.  I would overrule Rodriguez's eighth issue.

IV.  MOTION
FOR NEW TRIAL








In his ninth, tenth, and eleventh issues, Rodriguez
argues the trial court abused its discretion by denying his motion for new
trial because (1) the State failed to disclose a witness, officer Patricia
Decanini, who had evidence favorable to the defense; (2) the newly discovered
evidence would have resulted in a different outcome; and (3) defense counsel
was ineffective by failing to discover officer Decanini's testimony before
trial.  The State counters that
Decanini's testimony was merely collateral or impeaching of other evidence and,
thus, Rodriguez did not show a reasonable probability that the result would
have been different.

A.  Standard
of ReviewBDenial of a Motion for New Trial

In criminal cases,
there is no common law right to a new trial. 
Banks v. State, 186 S.W. 840, 841 (1916).  The right is purely statutory.  Id.; see Drew v. State,
743 S.W.2d 207, 223 (Tex. Crim. App. 1987) (en banc); see also Tex. R. App. P. 21.2.  We review the grant or denial of a motion for
new trial under an abuse of discretion standard.  See Lewis v. State, 911 S.W.2d 1, 7 (Tex.
Crim. App. 1995) (en banc).   We may not
substitute our judgment for that of the trial court, Cantu v. State, 842
S.W.2d 667, 682 (Tex. Crim App. 1992) (en banc), and credibility of the
witnesses is primarily a determination for the trial court.  Hoyos v. State, 951 S.W.2d 503, 511
(Tex. App.BHouston [14th Dist.]
1997), aff'd, 982 S.W.2d 419 (Tex. Crim. App. 1998).  As finder of fact, the trial court may accept
or reject any or all of the testimony given by State or defense witnesses.  Johnson v. State, 571 S.W.2d 170, 173
(Tex. Crim. App. 1978); see also Guzman, 955 S.W.2d at 89.  Thus, we are authorized to: (1) apply a
deferential standard of review to the trial court's resolution of historical
facts; and (2) may rely upon implied findings of fact that are supported by the
record to uphold the trial court's ruling, even when the trial court is not
faced with expressly conflicting affidavits or testimony.  Charles v. State, 146 S.W.3d 204, 206
(Tex. Crim. App. 2004); Villarreal v. State, 79 S.W.3d 806, 811-12 (Tex.
App.BCorpus Christi 2002,
pet. ref'd).








B.  The Brady
Claim

In his ninth issue, Rodriguez asserts that the Brady
violation requires a new trial.  See Brady v. Maryland, 373 U.S. 83, 87-88
(1963).  Specifically, he complains the
State was required to disclose to him the existence of officer Decanini, who,
in essence, would testify that officer Rodriguez (1) destroyed sergeant De Hoyos's
police report favorable to Rodriguez, and
(2) stated he was going "to get" Rodriguez.  

1.  The Law








Prosecutors are
prohibited from suppressing facts or secreting witnesses who may establish the
innocence of the accused.  Tex. Code Crim. Proc. Ann. art. 2.01
(Vernon 2005).   A defendant in a criminal case must be
granted a new trial when evidence tending to establish the defendant=s innocence has been
intentionally withheld, thus preventing its production at trial.  Tex.
R. App. P. 21.3(e).  A Brady violation occurs if (1) the
State failed to disclose evidence, regardless of the prosecution=s good or bad faith; (2) the withheld evidence is
favorable to the defendant; and (3) the evidence is material, that is, there is
a reasonable probability that had the evidence been disclosed, the outcome of
the trial would have been different.[28]  Ex parte Richardson, 70 S.W.3d 865, 870
(Tex. Crim. App. 2002); Thomas v. State, 841 S.W.2d 399, 404 (Tex. Crim.
App. 1992) (en banc).  The prosecution
has no duty to turn over evidence not in its possession or not known to
exist.  State v. Blanco, 953
S.W.2d 799, 802-03 (Tex. App.BCorpus Christi 1997, pet. ref=d) (citing Hafdahl v. State, 805 S.W.2d 396,
399 n.3 (Tex. Crim. App. 1990) (en banc)). 
Although the prosecution has no duty to turn over evidence not in its possession
or not known to exist, the prosecution does have a duty to learn of any
favorable evidence known to others acting in the case on the State=s behalf, including the police.  Blanco, 953 S.W.2d at 802-03 (citing Kyles
v. Whitley, 514  U.S. 419, 419 (1995)). 








Our review of a prosecutor=s alleged failure to disclose exculpatory evidence
requires us to:  (1) employ a materiality
standard rather than a constitutional harmless-error standard in evaluating the
evidence; and (2) determine the materiality of the evidence in light of all
other evidence properly introduced at trial. 
Hampton v. State, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002).  We consider any adverse effect that the
prosecutor=s non-disclosure might have had on the preparation
or presentation of the accused=s case.  Thomas,
841 S.W.2d at 405.  We assess the
possibility that an adverse effect might have occurred in light of the totality
of the circumstances and with an awareness of the difficulty of reconstructing
in a post‑trial proceeding the course that the defense and the trial
would have taken had the defense not been misled by the prosecutor=s failure to disclose.  Id. 
To make this determination, we examine the alleged error in the context
of the overall strength of the State=s case.  Id.

2.  The Evidence

Rodriguez timely filed an amended motion for new
trial asserting, in part, a Brady violation and newly discovered
evidence.[29]
The trial court convened an evidentiary hearing.  








Officer Patricia Decanini testified that, post
trial, Rodriguez contacted her about a missing report, which was compiled by
sergeant De Hoyos, signed by officer Garcia, and showed Rodriguez passed the
sobriety test.[30]  Because she recalled the report, she compiled
the motion for new trial affidavit, which was admitted in evidence.  Decanini testified that De Hoyos gave her a
handwritten report and she offered to type it for him to make it
"professional."[31]  The report indicated that Rodriguez had
passed the field sobriety test.  Decanini
testified that the handwritten report was signed by officer Garcia, indicating
that he concurred with the opinions in the report.  On cross-examination, she conceded the
handwritten report did not have language stating that Garcia concurred with the
report, and that, because of his superior rank, and because it was not common
practice in the police department, De Hoyos did not need Garcia's signature or
approval.  After Decanini finished typing
the report, she gave it to De Hoyos and he signed it.  She gave the report to officer Rodriguez, who
made a derogatory comment about De Hoyos and and threw the report away.  Decanini further testified that officer
Rodriguez "always had a grudge against" Rodriguez.  Officer Rodriguez told her that he had worked
the case, had a good case, and was going to "[expletive] over the
judge."  Decanini admitted that none
of the police reports generated by any officer included her name.  She also admitted she was not involved in the
motor vehicle accident investigation.  








Rodriguez's lead counsel at trial testified that
co-counsel filed a Brady motion, which the trial court granted.[32]  The State's witness list did not include
Decanini.  Even so, trial counsel testified,
"I didn't rely on their witness list. 
I went out and did my own work." 
He did not receive the report. 
Trial counsel learned from grand jury testimony that a report may have
been destroyed.  Referring to a report
signed by both De Hoyos and Garcia, trial counsel testified he "asked if
the State had in its possession that alleged report that was
destroyed."  He learned about
Decanini the night before the motion for new trial hearing through conversing
with current defense counsel.  Trial
counsel recalled De Hoyos's testimony at trial regarding an original report he
prepared and officer Garcia signed.  He
further recalled testimony that officer Rodriguez claimed he did not have De
Hoyos's original report, and so De Hoyos compiled a supplemental report.  Trial counsel recalled that officer Garcia
denied at trial that he signed a report compiled by De Hoyos.  Decanini's testimony, in his opinion, had
impeachment value.  When asked if he
would have called her as a witness had he known about her, counsel answered,
"If the State had . . . I would have, yes."  The following colloquy ensured:

[Trial counsel]: 
I believe that there should have been some due diligence in trying to
locate the original report.

 

[Post-trial defense counsel]:  Right. 
And as the attorney in charge, you were never given this information
regarding officer Decanini; is that correct?

 

[Trial counsel]: 
I don't believe they possessed it, and I wasn't given it.  I believe if they had possessed it, I would
have been given it.  

 

On cross-examination, trial counsel testified that
grand jury testimony from E.  Jackson was
that a report was "destroyed, altered or missing."  Before trial, counsel knew: (1) about
"an original report signed by both Mr. Flavio Garcia and Sergeant De Hoyos;"
(2) officer Garcia testified he did not remember ever signing a report; (3) De
Hoyos testified that he had prepared the original report; (4) De Hoyos did not
testify that Decanini prepared it. 
Finally, when asked if the issue regarding an original report was
addressed to the jury, trial counsel responded, "The issue about an
original report, yes."








The trial court stated he presided over the jury
trial and remembered the testimony.[33]
The trial court denied the motion for new trial.   

3.  Analysis

Rodriguez argues that
the State failed to disclose Decanini as a potential witness.  Evidence at trial showed that De Hoyos
testified he prepared an original report and that it was missing.  The defense thoroughly cross-examined De
Hoyos, officer Garcia, and officer Rodriguez about a missing report.  At trial, officer Rodriguez denied he saw
another report by De Hoyos, and officer Garcia denied he signed a report
generated by De Hoyos.  Decanini admitted
that the report she typed did not contain language that officer Garcia
concurred with the report.  At trial,
officer Rodriguez provided favorable testimony that Rodriguez passed the
sobriety test.

Evidence at the motion
for new trial hearing did not establish that the State knew about Decanini or
had reason to believe that she was a potential witness.  See Zule v. State, 802 S.W.2d 28, 33
(Tex. App.BCorpus Christi 1990,
pet. ref'd).  Whatever impeachment value Decanini's testimony
might have had, other witnesses testified and were cross-examined extensively
about the missing report and its contents and the replacement report which did
not include officer Garcia's signature. 








In light of the other evidence introduced at trial,
I conclude that Rodriguez did not meet his burden of establishing the
materiality of evidence of the destruction of De Hoyos's report, the basis for
Decanini's testimony.  See Hampton,
86 S.W.3d at 605.  Similarly, I also
conclude that Rodriguez did not meet his burden to show a reasonable
probability that the result of the proceeding would have been different if the
identity of Decanini  as a potential
witness, or her proffered testimony, had been disclosed earlier to the
defense.  See Ex parte Richardson,
70 S.W.3d at 870.  I would overrule
Rodriguez's ninth issue.

C.  Newly
Discovered Evidence

By his tenth issue, Rodriguez argues that the
State's failure to disclose the newly discovered evidence relating to Decanini
mandates a new trial.  In particular, he
asserts that Decanini's testimony would have shown that officer Garcia in fact
agreed that Rodriguez "passed all the exams and that [officer] Rodriguez
was suppressing it."  The State
responds that the trial court properly denied the motion.

1.  The Law








A new trial shall be granted an accused where
material evidence favorable to the accused has been discovered since trial.  Tex.
Code Crim. Proc. Ann. art. 40.001 (Vernon Supp. 2004-05); see Brady,
373 U.S. at 87.  The party who moves for
a new trial based on newly-discovered evidence must satisfy a four‑part
test: (1) the newly discovered evidence was unknown or unavailable to the
accused at the time of his trial; (2) the accused's failure to discover or
obtain the evidence was not due to a lack of diligence; (3) the new evidence is
admissible and is not merely cumulative, corroborative, collateral, or
impeaching; and (4) the new evidence is probably true and will probably bring
about a different result in another trial. 
See Keeter v. State, 74 S.W.3d 31, 36‑37 (Tex. Crim. App.
2002); Drew, 743 S.W.2d at 226; Villarreal, 79 S.W.3d at 814. 

2.  Analysis








Rodriguez has not demonstrated that this
"new" evidence of a missing report was unknown to him before the
trial.  See Villarreal, 79 S.W.3d
at 814.  Trial counsel testified at the
motion for new trial hearing that, based on the record of the grand jury
proceedings, he knew there was a missing report and discussed this with the
prosecutor.  During the motion to
suppress hearing, De Hoyos testified about the missing report.  Trial counsel also further testified that he
did not rely on the State=s witness list and did his own work.  He further testified that he learned about
Decanini the night before the motion for new trial hearing.  I have already concluded that whatever
impeachment value derived from the information Decanini proffered, other
witnesses testified and were cross-examined extensively on the same subject at
trial.  In light of the other evidence
introduced at trial and the evidence adduced at the motion for new trial
hearing, I conclude that the evidence was not "newly discovered," but
instead existed before trial, both through De Hoyos's pretrial testimony and
through grand jury testimony.  This was
acknowledged by trial counsel.  See
Villarreal, 79 S.W.3d at 814. 
Further, Rodriguez did not establish 
(1) the failure to discover the "new" evidence was not due to
a want of diligence on his part (see id.; see also Drew,
743 S.W.2d at 226); or (2) the "new evidence" was material; or (3) it
was not merely cumulative, corroborative, collateral, or impeaching.  Id. 
I would overrule Rodriguez's tenth issue.

D.  Effective
Assistance of Counsel

In his eleventh issue, Rodriguez argues that trial
counsel was ineffective because he did not discover Decanini and her proffered
evidence before trial.  








In reviewing an
ineffective assistance of counsel claim, we evaluate the effectiveness of
counsel under the two‑pronged test enunciated in Strickland v.
Washington, 466 U.S. 668 (1984).  See Hernandez v. State, 988 S.W.2d 770,
774 (Tex. Crim. App. 1999).  First, the
defendant must show that his counsel's representation fell below an objective
standard of reasonableness.  Strickland,
466 U.S. at 688.  To prove this
deficiency in representation, the defendant must demonstrate that his counsel's
performance deviated from prevailing professional norms.  Strickland, 466 U.S. at 688; McFarland
v. State, 845 S.W.2d 824, 842‑43 (Tex. Crim. App. 1992).  Second, the defendant must show
prejudice.  Strickland, 466 U.S.
at 687.  This requires the defendant to
show that there is a reasonable probability that but for his counsel's
unprofessional errors the result of the proceeding would have been different.  Id. at 694.  A reasonable probability is a probability
sufficient to undermine confidence in the outcome.  Id. 
The failure to satisfy one prong of the Strickland test
negates a court's need to consider the other. 
See id. at 697.  An
appellant bears the burden of proving by a preponderance of the evidence that
his counsel was ineffective.  Thompson
v. State, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). 

In his motion for new
trial and at the motion for new trial hearing, Rodriguez did not assert that
his trial counsel was ineffective.  I
have already concluded that Rodriguez has not shown that the outcome of the
trial would have been different had Decanini=s proffered evidence been discovered.  I similarly conclude that, on this record,
Rodriguez has not shown that, but for the complained of error,  the result of the trial would have been
different.  Accordingly, Rodriguez has
not met the first Strickland prong. See Strickland, 466 U.S. at
688; see also Jackson v. State, 877 S.W.2d 768, 771 (Tex. Crim. App.
1994).  I would overrule Rodriguez=s eleventh issue.

V. CONCLUSION

Having overruled
Rodriguez=s eleven issues, I
concur with the majority's decision to affirm.

ERRLINDA CASTILLO

                                                                        
                       Justice 

Publish.

Tex. R. App. P.
47.2(b).

 

Concurring
Opinion delivered and filed

this
the 7th day of April, 2006.

 

 











[1]  See Tex.
Pen. Code Ann. ' 49.07(a)(1) (Vernon 2003).





[2] 
After the State rested its case during the culpability phase, the trial
court granted Rodriguez's motion for acquittal as to one count of aggravated
assault.  





[3] 
By his first and second issues, Rodriguez argues legal and factual
insufficiency of the evidence.  By his
third and fourth issues, he asserts the trial court erred in denying his motion
to suppress based on an unlawful arrest and unlawful detention.  By his fifth, sixth, and seventh issues, he
argues the trial court erred in not suppressing the videotape and the breath
test.  By his eighth issue, he argues the
trial court erred by excluding relevant evidence.  By his ninth and tenth issues, Rodriguez
argues the trial court erred by denying his motion for new trial based on Brady
violations and newly discovered evidence. 
By his eleventh issue, he asserts that his trial counsel was
ineffective.

 

 





[4] 
Perez testified she had driven motorcycles for approximately
thirty-seven years, and  doing so was a
way of life for her family, a hobby, and a stress reliever.  





[5] 
Cano testified the brand of beer in the front of the van differed from
the brand of beer located in the rear. 





[6] 
Cano explained that he installed his own camera on the unit dashboard
for his personal safety and for training purposes.  





[7] 
Evidence showed that witnesses with the last name of Rodriguez are not
related.  





[8] 
The testimony of an officer that a person is intoxicated provides
sufficient evidence to es-tablish the element of intoxication. Gruber v.
State, 812 S.W.2d 368, 370 (Tex. App.BCorpus Christi 1991, pet. ref=d) (citing Annis v. State,
578 S.W.2d 406, 407 (Tex. Crim. App. 1979) and Whisenant v. State, 557
S.W.2d 102, 105 (Tex. Crim. App. 1977)). 






[9] 
The tests included the horizontal gaze nystagmus, one leg balance, and
heel‑to‑toe tests.   





[10] 
When asked why his police report showed an "hour and twenty
minutes," officer Rodriguez explained he was engaged in discussions with
Rodriguez and Jackson.  Both Rodriguez
and Jackson testified that, when officer Rodriguez arrived, they asked him
about the victim=s condition.  





[11] 
Rodriguez does not contest the serious bodily injury element.  The penal code defines"serious bodily
injury" as an "injury that creates a substantial risk of death or
that causes serious permanent disfigurement or protracted loss or impairment of
the function of any bodily member or organ."  Tex. Pen. Code Ann. _ 49.07(b) (Vernon 2003).    





[12] 
As grounds, the motion requested the trial court to suppress "all
evidence seized as a result of the arrest of Defendant and the search of
Defendant as well as all statements, either written or oral, made after such
arrest." 





[13] 
Article 38.22 governs the use of oral statements of the accused made as
the result of custodial interrogation.  Tex. Code Crim. Proc. Ann. art.
38.22(3) (Vernon 2005).  





[14] 
Article 38.23(a) states, in relevant part, "No evidence obtained by
an officer or other person in violation of any provisions of the Constitution
or laws of the State of Texas, or of the Constitution or laws of the United
States of America, shall be admitted in evidence against the accused on the
trial of any criminal case." Tex.
Code Crim. Proc. Ann. art. 38.23(a) (Vernon 2005).

 

 





[15] 
Rodriguez did not object when the State reintroduced the suppression
issues and, indeed, fully participated in the relitigation of the issues in his
cross‑examination of the State's witnesses.





[16] 
Defense counsel conceded during argument in the suppression hearing that
"this isn't a standard protocol case."  The trial court responded, "Because it
involves a judge."  





[17] 
De Hoyos testified at trial that, because of Rodriguez's position as a
municipal judge, he did not want to subject him to sobriety testing at the
scene in front of bystanders.  





[18] 
However, officer Garcia testified that Rodriguez walked around freely
and, when De Hoyos arrived, Rodriguez met with De Hoyos and the police chief in
De Hoyos' office.  





[19] 
By contrast, at trial, Rodriguez testified he was released and then
asked Jackson, who was outside with Rodriguez's son, for a ride home. 





[20] 
The Texas Transportation Code provides that a person arrested for DWI
must be informed that, if the person is 21 years of age or older, submits to
the taking of a specimen, and the specimen shows that the person had an alcohol
concentration of a level specified by Chapter 49 of the Texas Penal Code, then
the person's license to operate a motor vehicle will automatically be suspended
for not fewer than 90 days.  See Tex. Transp. Code Ann. ' 724.015(3) (Vernon Supp. 2004‑05).  A person must also be warned that two
specific consequences will result from a refusal to submit to a breath test: (1)
the person's driver's license will be suspended automatically for not fewer
than 180 days; and (2) evidence of the refusal is admissible against the person
in court.  Tex. Transp. Code Ann. ' 724.015(1), (2) (Vernon Supp. 2004‑05).





[21] The Fourth Amendment provides:

 

The right of the people to be
secure in their persons, houses, papers, and effects, against unreasonable
searches and seizures, shall not be violated, and no Warrants shall issue, but
upon probable cause, supported by Oath or affirmation, and particularly
describing the place to be searched, and the persons or things to be seized.

 

U.S.
Const. amend. IV; see
also Tex. Code. Crim. Proc. Ann.
art. 38.23 (Vernon 2005). 





[22] See Nenno v. State, 970 S.W.2d 549, 557 (Tex. Crim.
App. 1998), overruled on other grounds, State v. Terrazas, 4. S.W.3d
720, 725 (Tex. Crim. App. 1999) (en banc) (noting that a one hour interview is
a short time period).





[23] 
See Tex. Pen. Code Ann.
_ 49.07(b) (Vernon 2003).  





[24] 
Texas Transportation Code section 724.011 states:

 

If a person is arrested for an
offense arising out of acts alleged to have been committed while the person was
operating a motor vehicle in a public place, or a watercraft, while
intoxicated, or an offense under section 106.41, Alcoholic Beverage Code, the
person is deemed to have consented, subject to this chapter, to submit to the
taking of one or more specimens of the person's breath or blood for analysis to
determine the alcohol concentration or the presence in the person's body of a
controlled substance, drug, dangerous drug, or other substance.

 

Tex.
Transp. Code Ann. ' 724.011 (Vernon 1999).





[25] Section 724.061 states:

 

A person's refusal of a request by
an officer to submit to the taking of a specimen of breath or blood, whether
the refusal was express or the result of an intentional failure to give the
specimen, may be introduced into evidence at the person's trial.

 

Tex.
Transp. Code Ann. ' 724.061 (Vernon 1999).





[26] 
The defense theory was that Rodriguez was charged for political reasons,
not because he was guilty, and "someone took advantage and tried to
politicize a tragic event."   





[27] 
An abuse of discretion occurs when the trial court acts arbitrarily or
unreasonably, without reference to guiding rules or principles.  Montgomery v. State, 810 S.W.2d 372, 379
(Tex. Crim. App. 1990).  In other words,
an abuse of discretion occurs only when the trial court's decision is so wrong
as to lie outside that zone within which reasonable persons might disagree.  Id. 






[28] 
Favorable evidence is any evidence, if disclosed and used effectively,
that may make the difference between conviction and acquittal.  Thomas v. State, 841 S.W.2d  399, 404 (Tex. Crim. App. 1992).  Favorable evidence includes both exculpatory
and impeachment evidence.  Wyatt v.
State, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000); Thomas, 841 S.W.2d
at 404.  Exculpatory evidence is that
which tends to justify, excuse, or clear the accused of  fault or guilt.  Id. 
Impeachment evidence is that which disputes, disparages, denies, or
contradicts a witness's testimony.  Id.  Evidence is material if it creates a
probability sufficient to undermine confidence in the outcome of the
proceeding. Id.  An appellant must
also show that the State's nondisclosure or tardy disclosure prejudiced the
defense.  Little v. State, 991
S.W.2d 864, 867 (Tex. Crim. App. 1999). 
To show prejudice, an appellant must show a reasonable probability that
the result of the proceeding would have been different had the State timely
disclosed the evidence to the defense.  Id.
at 866.  





[29] 
The time for filing motions for new trial and amended motions for new
trial in criminal cases is presently governed by Texas Rule of Appellate
Procedure 21.4.  See Tex. R. App. P. 21.4.  Under ordinary statutory construction, we
apply the plain meaning of the words contained in the rule unless such
application would lead to an absurd result. 
State v. Hardy, 963 S.W.2d 516, 519 (Tex. Crim. App. 1997).  The rule does not authorize an amendment of a
motion after the thirty days have expired, even with leave of court.  Id.; see also Drew v. State,
743 S.W.2d 207, 222-23 (Tex. Crim. App. 1987) (en banc) (construing former
rule).  Judgment below was entered on
June 28, 2002.  Rodriguez's amended
motion for new trial, filed on July 29, 2002, was timely because the thirtieth
day, July 28, fell on a Sunday.   





[30] 
At the hearing, Decanini recanted the following statement in her motion
for new trial affidavit:  "I was
advised by Judge Rodriguez [appellant] about some reports that were never
brought up on the last trial he had . . . ."  She later testified that everything in the
affidavit was correct.  





[31] 
Decanini had been employed with the police department three months in
November 2001,  admittedly learning
departmental policies and procedures during that time.   Her duties at the time were to assist in the
preparation of reports.





[32] 
He testified that three attorneys represented Rodriguez during
trial.  Different counsel represented
Rodriguez during post-trial proceedings. 






[33] 
During argument at the motion for new trial hearing, the trial court
addressed Rodriguez's post-trial counsel stating, A[y]ou weren't here at the time of
trial, but I can assure you it was exhausted to no end, almost to the point of
having nausea regarding a missing report. 
If you'll look at the transcript of the trial B."  Similarly, we may take judicial notice of its
records in the same, or related proceedings involving the same or nearly the
same parties.  Huffman v. State,
479 S.W.2d 62, 68 (Tex. Crim. App. 1972).